**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

CHAMBERS OF
TIMOTHY J. SULLIVAN
CHIEF MAGISTRATE JUDGE

6500 Cherrywood Lane
Greenbelt, Maryland 20770
Telephone: (301) 344-3593
MDD_TJSchambers@mdd.uscourts.gov

March 5, 2024

LETTER TO COUNSEL:

Re:     *Zheng Joan Wang v. AMDEX Corp.*
        Civil Case No. TJS-22-2266

Dear Counsel,

This case is assigned to me for all proceedings by the parties' consent, pursuant to 28 U.S.C. § 636(c). ECF No. 16. Pending before the Court are the following motions: Defendant-Counterclaimant AMDEX Corporation's ("Amdex") "Partial Motion to Dismiss and/or for Partial Summary Judgment" (ECF No. 27) and "Motion to Dismiss and/or for Summary Judgment as to Count One of Plaintiff's Complaint with Supporting Affidavit" (ECF No. 28), and Plaintiff-Counterclaim Defendant Zheng Joan Wang's ("Wang") Motion for Summary Judgment (ECF No. 42). Having considered the parties' submissions (ECF Nos. 27, 28, 34, 35, 36, 42, 49 & 52), I find that a hearing is unnecessary. *See* Loc. R. 105.6. For the following reasons, all motions will be denied.

## I.      Procedural Background

This case arises out of the soured relationship between Wang and Amdex, which resulted from Wang's sale of the stock in her business to Amdex, and Amdex's purported failure to pay Wang what she is owed. Wang's Complaint (ECF No. 1) states two claims: breach of contract and specific performance. *Id.* In response, Amdex filed a Counterclaim with the same two claims: breach of contract and specific performance. ECF No. 8. The Court then entered a scheduling order and the parties completed discovery. After the deadline to file Rule 12(b)(6) motions, before the close of discovery, and contrary to Local Rule 105.2(c), Amdex filed its motions (ECF Nos. 27 & 28). After the completion of discovery, the Court denied Wang's motion for leave to amend her Complaint, ECF No. 40, and Wang moved for summary judgment. The motions are all ripe for decision.

## II.     Legal Standard

The Court will construe all of the motions as motions for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict for the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). Yet the "mere existence of a scintilla of evidence in support of the [opposing party's] position" cannot defeat a motion for summary judgment. *Id.* at 252.

The facts themselves, and the inferences to be drawn from those facts, must be viewed in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). A party may not rest on the mere allegations or denials of its pleading but must cite "particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

## III.    Factual Background

Unless otherwise indicated, the following facts are not in dispute. To the extent that any facts are in dispute, they will be viewed in the light most favorable to the non-moving party. *Scott*, 550 U.S. at 380 ("At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.").

On April 9, 2021, Wang sold all of the stock in her business, Avar Consulting, Inc. ("Avar"), to Amdex. ECF No. 1 at 2. The sale was structured through a Stock Purchase Agreement ("SPA"). *See* ECF No. 42-5. The parties do not dispute that the SPA is a valid and enforceable contract. *See* ECF Nos. 27 at 2 & 42-3 at 1. The SPA "contemplated a set aside of funds in three defined escrows that would assure both [Amdex and Wang] to be made whole in the event of post-sale contingencies." ECF No. 27 at 2. To this end, the parties also entered into an Escrow Agreement, *see* ECF No. 42-6, which named Citibank, N.A. ("Citibank") as escrow agent. The Escrow Agreement established three escrow accounts: the Adjustment Escrow, the Indemnity Escrow, and the Recompete Escrow. *Id.*

For the Adjustment Escrow account, Amdex was required to deposit $112,500 with Citibank "for purposes of funding any amounts payable under Section 2.3, Post-Closing Adjustment," of the SPA. ECF No. 42-6 at 2. The Post-Closing Adjustment section of the SPA provided that Amdex would have 60 days following the closing date (defined in the SPA as April 9, 2021, *see* ECF No. 42-5 at 6) to deliver to Wang a "Closing Statement." *Id.* at 22. The Closing Statement was to include Amdex's "good faith determination" of five amounts: (1) the Closing Balance Sheet and actual Net Working Capital as of the Closing; (2) the amount of Indebtedness as of the Closing; (3) the amount of Transaction Expenses as of the Closing; (4) the amount of Cash as of the Closing; and (5) the proposed amount of the Final Purchase Price. *Id.* The Closing Statement was also to include Amdex's supporting schedules and worksheets showing its calculations. *Id.* The SPA provides a mechanism for the resolution of disputes about calculations in the Closing Statement. *Id.* at 22-23.

For the Indemnity Escrow account, Amdex was required to deposit $1.16 million with Citibank "for purposes of funding any amounts payable under Article VIII, Indemnification," of the SPA. ECF No. 42-6 at 2. The Indemnification section of the SPA provides terms under which

Wang and Amdex will be required to indemnify each other for breaches of the SPA or claims that arise after the Closing. ECF No. 42-5 at 71- 72.

The Recompete Escrow is funded by Amdex in the amount of $1.4 million "for purposes of funding any amounts payable under Section 2.4, Recompete Payments; Covenants During Restrictive Period," of the SPA. ECF No 42-6 at 2. The SPA provides that the Recompete Payments "will be released and provided to [Wang] on a rolling basis," after certain government contracts are awarded to Avar. ECF No. 42-5 at 24-25. And so long as the Recomplete Escrow is not depleted, the SPA provides that Wang will be entitled

> to a release from the Recompete Escrow Account of an amount equal to 6.5% of the Actual Award Value of the aggregate of all Government Contracts arising out of any of the opportunities identified on the waterfall report attached as Exhibit E hereto (the "Waterfall Report Contracts") that were awarded to the Company between January 21, 2021 and December 31, 2021[.]

*Id.* at 27.

## IV.    Discussion

### A.    Amdex's Motions (ECF Nos. 27 & 28)

Amdex seeks summary judgment on two issues: (1) that Wang is not entitled to the damages she seeks in Count II of her Complaint because the SPA bars them as consequential damages (ECF No. 27), and (2) that Wang's claim in Count I is moot (EF No. 28). Wang opposes the motions. ECF Nos. 34 & 35.

The SPA defines "Damages" as follows:

> "Damages" means any judgments, fines, losses, claims, damages, penalties, interest, Liabilities, Proceedings, demands, deficiencies, awards, assessments, payments, costs or expenses (including reasonable attorneys' fees and accountants' fees) actually paid; provided, however, that "Damages" shall in no event be calculated to include, and no party or any other Person shall have any right to, losses or damages based on diminution in value, multiples of profit or cash flows, or any other premium methodology, or consequential, special, exemplary, or punitive damages, except and only to the extent that such damages are awarded to a third party, under any contract, tort, strict liability, negligence, or other legal or equitable claim or theory, whether or not such party or other Person was informed or was aware of the possibility of such loss or damage.

ECF No. 42-5 at 9.[1]

---

[1] The SPA provides that it is "governed by and construed in accordance with the Laws of the State of Maryland without reference to, or application of" any conflicts rules that might require the application of the law of any jurisdictions other than Maryland. ECF No. 42-5 at 78. Because

The SPA also sets the terms for how Wang and Amdex will pay the expenses incurred in connection with the carrying out the agreement:

> SECTION 9.13 Fees, Costs and Expenses. Except as otherwise expressly set forth herein (including with respect to Transaction Expenses), all fees, costs and expenses (including attorney's fees and fees of other professional advisors) incurred in connection with the transactions contemplated by this Agreement shall be paid by the Party incurring such fees, costs and expenses.

ECF No. 42-5 at 80. In other words, Wang and Amdex agreed to bear their own expenses for Wang's sale of Avar to Amdex.

Amdex interprets the SPA's definition of "Damages" and its terms regarding the payment of fees incurred in connection with the transactions underlying the agreement as barring the damages that Wang seeks in Count II of her Complaint. The Court disagrees.

When interpreting contracts, "the clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or intended it to mean; where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed." *Bd. of Trustees of State Colleges v. Sherman*, 280 Md. 373, 380 (1977). The SPA's definition of "Damages" is unambiguous. The damages allowed under the SPA include interest. ECF No. 42-5 at 9. The SPA does not distinguish between prejudgment and post-judgment interest. The SPA also does not state that prejudgment interest is a "consequential" damage, which is disallowed as to direct claims between the parties. Amdex's suggestion that the SPA defines prejudgment interest as a consequential damage conflicts with the plain terms of the SPA. And its interpretation of consequential damages deviates from long-standing case law. *See, e.g.*, *Hoang v. Hewitt Ave. Assocs., LLC*, 177 Md. App. 562, 594, 936 A.2d 915, 934 (2007) (citing *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854)); *Donnelly v. Rosas*, No. RDB-17-1486, 2018 WL 3862233, at *7 (D. Md. Aug. 14, 2018) ("Special, or consequential, damages are those that are unusual for the type of claim in question—that are not the natural damages associated with such a claim.") (internal quotation marks omitted). Amdex does not explain why prejudgment interest should be considered a consequential damage at the same time when post-judgment interest is not. The Court declines Amdex's invitation to read ambiguity into the SPA where none exists. Prejudgment interest is available as a form of damages under the SPA.

The same goes for Amdex's argument that attorney's fees and accountants fees are not allowed. The SPA specifically provides that such costs and expenses are recoverable as damages. Section 9.13 has no bearing on this point. That section relates only to the fees, costs, and expenses incurred in connection with the transactions underlying the agreement. It does not concern damages that might arise in the event of a breach of the agreement. Here, Wang only seeks

---

of this choice of law provision, and because the parties have applied Maryland law in their arguments, the Court will apply Maryland substantive law.

damages alleged to have arisen from Amdex's breach of its obligations under the SPA. The SPA does not bar her recovery of such damages if she prevails on her claims.

Because Amdex has not shown that it is entitled to judgment as a matter of law on the issue of Wang's entitlement to prejudgment interest and professional fees, its motion (ECF No. 27) is **DENIED**.[2]

In its second motion (ECF No. 28), Amdex seeks dismissal or summary judgment as to Wang's specific performance claim in Count I of her Complaint. Amdex argues that "Wang's claims for specific performance . . . have been accommodated," and are therefore moot. *Id.* But Wang disagrees. *See* ECF No. 35. She states that Amdex continues to refuse to provide the documents that she is owed under the SPA. ECF No. 35-1 at 1-2. And she insists that if contracts were won by Avar or Amdex before a certain deadline, she is entitled to receive funds from the Recompete Escrow Account. *Id.* Wang argues that she is entitled to a copy of all Waterfall Report Contracts, which had not been produced (at least at the time the parties' briefs were submitted— during the middle of discovery). *Id.* Amdex did not reply to the points that Wang claims remain in dispute.[3] For the reasons stated in Wang's response brief and affidavit (ECF Nos. 35 & 35-1), the Court finds that material facts remain in dispute about whether Wang's claim for specific performance has been satisfied. Amdex has not shown that it is entitled to judgment as a matter of law. For these reasons, Amdex's motion (ECF No. 28) is **DENIED**.

### B.   Wang's Motion (ECF No. 42)

Wang seeks summary judgment on her claims for specific performance and breach of contract, and for Amdex's counterclaims. The Court will address her arguments in turn.

### 1.   Count I – Specific Performance

Wang seeks summary judgment on her claim for specific performance (Count 1). ECF No. 42 at 4-8. Wang states that Amdex breached the SPA by failing (1) to notify her of the awards of four recompete contracts, (2) to provide her with copies of contracts, (3) to make the contractually agreed payments to her, and (4) to provide her a Waterfall Release Calculation[4] by March 24, 2023. *Id.* at 6. Wang argues that she must have the Waterfall Release Calculation to determine the final amount due from the Recompete Escrow Account. *Id.* at 7. The money still owed to Wang is held in the Recompete Escrow Account and any payment from the account may "only be released by joint written instructions signed by both Parties." *Id.* Wang contends that specific performance

---

[2] Of course, this goes both ways. Assuming Amdex has properly pled its claims for damages, and that it has disclosed those damages during discovery if requested to do so, Amdex may be entitled to an award of prejudgment interest, attorney's fees, and accountant's fees if the Court renders a judgment in Amdex's favor.

[3] The docket entry for ECF No. 36 is incorrect. This document is Amdex's reply concerning its first motion (ECF No. 27).

[4] This calculation was to "set[] forth in reasonable detail [Amdex's] determination of the amount of the funds to be released from the Recompete Escrow Account with respect to the Waterfall Report Contracts." *Id.*

is the only remedy available to compel Amdex to generate the Waterfall Release Calculation (because it holds the information necessary to make the calculation) and to sign the joint release instructions for the release of the proper Recompete Payment from the Recompete Escrow Account, which Wang states is $64,983.31. *Id.*

In response, Amdex does not dispute that specific performance is available as a remedy under the SPA. ECF No. 49 at 20-23. Instead, it argues that Wang is not entitled to the release of any Recompete Payments, including one for the contract that the parties call the DOL-CEO contract. *Id.* at 20. Amdex explains that the DOL-CEO contract was awarded to Avar on September 18, 2020, before the Closing Date. *Id.* Amdex explains that this "contract, along with its option years, was one of the Avar assets purchased by Amdex." *Id.* Amdex concedes that the Government "issued a contract modification exercising an option year on the DOL/CEO contract" in September 2021, but argues that the "[e]xercise of a previously awarded option year is not the same thing as winning new work." *Id.* Under Amdex's interpretation of the SPA, the exercise of an option year on a contract awarded before the Closing Date does not qualify Wang for a corresponding Recompete Payment. *Id.* at 21-22.

The SPA states that "Recompete Escrow Funds will be released and payable to Seller on a rolling basis," as provided in the SPA, and "upon the successful Final Award to the Company of . . . the Waterfall Report Contracts." ECF No. 42-5 at 24-25. The SPA defines Waterfall Report Contracts as "Government Contracts arising out of any of the opportunities identified on the waterfall report attached as Exhibit E." *Id.* at 27. The parties agree that the DOL-CEO contract is "[o]ne of the Waterfall Contracts" listed in Exhibit E. ECF No. 49-1 at 20.

Under the unambiguous terms of the SPA, Wang could be entitled to a Recompete Payment for the award of the DOL-CEO contract to Avar. The DOL-CEO contract was listed on Exhibit E to the SPA. The SPA states that Wang would be paid for any contracts on Exhibit E that were awarded to Avar. It is undisputed that the DOL-CEO contract was awarded to Avar.

The Court rejects Amdex's arguments to the contrary. Amdex interprets the SPA's definition of "Government Contracts" to exclude the exercise of options. But the SPA defines "Government Contract" broadly, and the definition does not exclude the exercise of an option to an existing contract. Further, the very option that was exercised is listed on Exhibit E to the SPA. The parties agreed that Exhibit E was the reference point for which contracts might produce Recompete Payments to Wang. For the same reason, Amdex's argument that the DOL-CEO contract, along with its option years, was one of the assets purchased by Amdex is not persuasive. Amdex has not supported this assertion with competent evidence, *see* Fed. R. Civ. P. 56(c), (e), and it runs contrary to the plain language of the SPA. Again, the SPA specifically defines the DOL-CEO contract as one that requires a Recompete Payment to Wang if it is successfully awarded.

Still, Wang has not shown that she is entitled to judgment on this count because there are disputed facts as to other claims, which are discussed below. Wang may not be entitled to any Recompete Payment if a factfinder determines that Amdex may withhold the payment as a set-off under Section 8.9 of the SPA.

And as for the Waterfall Release Calculation that Wang insists must be provided to her, the Court is not persuaded that specific performance is an appropriate remedy, at least not now. Contrary to Wang's argument, the Court does not find that "the Waterfall Release Calculation is a report uniquely within the power of Amdex to produce." ECF No. 42 at 7. Wang had the opportunity to conduct discovery. Through discovery, Wang could have determined which of the Waterfall Contracts had been awarded and how much she is owed. While specific performance is a favored remedy under the SPA, *see* ECF No. 42-5 at 80, Wang has not shown that she is entitled to summary judgment on the issue. *See Archway Motors, Inc. v. Herman*, 37 Md. App. 674, 681 (1977) ("Specific performance is considered an extraordinary equitable remedy which may be granted, in the discretion of the chancellor, where more traditional remedies, such as damages, are either unavailable or inadequate."); ECF No. 42 at 5 (collecting cases on the point of specific performance being an extraordinary remedy).

In summary, Wang's entitlement to any Recompete Payment is contingent on a factfinder's determination of whether Amdex is permitted to withhold that payment as a set-off under the SPA. Because this determination depends on disputed facts, the Court is unable to resolve it at this stage. And Wang has not shown that she is entitled to specific performance as it relates to the Waterfall Release Calculation. Accordingly, Wang's motion for summary judgment (ECF No. 42) is **DENIED** as to her claim for specific performance (Count I).[5]

### 2.    Breach of Contract

Wang also seeks summary judgment for her breach of contract claim (Count II). She claims that Amdex owes her money under the Closing Statement that she produced to Amdex. But Amdex claims that Wang owes it money under its own terms. Both sides have supported their positions with evidence. Because there are material facts in dispute, Wang is not entitled to summary judgment on her breach of contract claim. *See, e.g.*, *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015) ("The court therefore cannot weigh the evidence or make credibility determinations.").

Wang argues that Amdex has no right to any "set-off" under Section 8.9 of the SPA because it did not properly seek indemnification under Article VIII. But a reasonable factfinder could disagree. Section 8.9 of the SPA states:

---

[5] The parties did themselves no favors by structuring their briefs as they did. Instead of submitting linear arguments with citations to evidence supporting their positions, Wang filed a statement of material facts not in dispute, to which Amdex responded, and Wang replied. When parties submit motions for summary judgment that cross-reference "undisputed facts" (especially where the material facts are, in the end, disputed) they skirt the page limitations of Local Rule 105.3, and they require the Court to cross-reference three additional documents—none of which are admissible as evidence under Rule 56—to determine whether certain facts are in dispute. For good reason, the undersigned does not solicit statements of undisputed facts with summary judgment motions. *See generally Feldman's Med. Ctr. Pharmacy, Inc. v. CareFirst, Inc.*, No. SKG-10-254, 2011 WL 4007948, at *2 (D. Md. June 17, 2011).

Right to Set-Off. From and after the Closing Date, in addition to any other remedy, [Amdex] has the right but not the obligation, to set-off any other amount that [Wang] owes [Amdex] . . . under this Agreement against any amounts owed to [Wang] pursuant to Section 2.4, provided, that, any indemnification sought by [Amdex] pursuant to this Article VIII shall first be recovered from the Indemnity Escrow Funds until such time as the Indemnity Escrow Funds are depleted.

ECF No. 42-5 at 76.

Under the plain meaning of this section, Amdex has the right to set-off any amount that Wang owes Amdex against any amounts Amdex owes Wang for Recompete Payments (under Section 2.4), but it must (1) only do so using the indemnification procedures of Article VIII of the SPA, and (2) deplete the Indemnity Escrow Funds account first. Once Amdex has depleted the Indemnity Escrow funds, using the indemnification procedures of the SPA, it may it exercise its right to set-off under Section 8.9.

There is no dispute that the Indemnity Escrow funds have been returned to Wang. But it is not clear whether this means that the funds are "depleted" within the meaning of Section 8.9. Neither party has submitted sufficient evidence to convince the Court that its interpretation of this section should control (the parties' arguments barely touch on the issue). A reasonable factfinder could determine that the Indemnity Escrow Funds have been depleted, and that, subject to additional findings explained below, Amdex is entitled to set-off any amount that Wang owes Amdex against the Recompete Payment it owes to Wang.

In addition to its right to set-off under the SPA, Amdex may also seek indemnification from Wang for damages arising from:

(i) the breach or non-fulfillment by Seller of any covenant, obligation or agreement to be performed or observed by Seller pursuant to [the SPA];
(ii) any inaccuracy in or breach of any representation or warranty made by Seller in Article III or Article IV in [the SPA] or made by Seller or the Company in any certificate or instrument delivered by or on behalf of Seller or the Company pursuant to [the SPA];
(iii) any underestimation of the Final Indebtedness or Final Transaction Expenses not previously paid or expressly included in, the determination of the Flow of Funds Memorandum or the Post-Closing Adjustment;
(iv) claims based on Fraud committed by Seller.

ECF No. 42-5 at 71.

Amdex's right to indemnification is subject to certain conditions. Section 8.4 of the SPA contains the parties' agreed-upon indemnification procedures. *Id.* at 73. Section 8.4(c) states that "any claim by an Indemnified Party" that does not result from a Third-Party Claim (a "Direct Claim") shall be asserted by the Indemnified Party giving the Indemnifying Party prompt written notice thereof." *Id.* at 75. The written notice is required to "describe the Direct Claim," "include copies of all material written evidence thereof (to the extent in the possession of the Indemnified

Party),” and indicate the estimated amount of damages sustained. *Id.* Thereafter, the Indemnifying Party has 30 days to respond. *Id.* The parties agreed to use “commercially reasonable efforts” to resolve such disputes “within 30 days after the date such notice of dispute is received” by the Indemnifying Party. *Id.* And if the Indemnifying Party does not respond, the SPA provides:

> the Indemnifying Party shall be deemed to have agreed to and accepted such claim and shall satisfy its obligations and pay the amount of such Damages with respect to such claim in accordance with Section 8.7.

*Id.*

Wang states that “Amdex has submitted no claims for indemnification.” ECF No. 52 at 12. But Amdex disputes this point. ECF No. 49-1 at 12. And it supports its position with evidence. The Court cannot find, as Wang requests, that Amdex did not properly submit claims for indemnification under the SPA. Section 8.4 contains another provision that neither party addresses:

> The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except to the extent that the Indemnifying Party is materially prejudiced or forfeits material rights or defenses by reason of such failure to give notice.

ECF No. 42-5 at 75.

Even assuming that Amdex’s notice of a Direct Claim under Section 8.4 did not meet the technical requirements of that section, Wang might still be required to indemnify Amdex for the damages it claims. Indeed, Wang has submitted no evidence that she has been materially prejudiced, or has forfeited “material rights or defenses” by Amdex’s failure.

Some disputes between the parties on Wang’s breach of contract claim are over facts. These disputes must be resolved by a factfinder. Other disputes are legal issues that can be resolved by the Court, but those disputes can only be resolved once the facts are settled. In any case, Wang has not shown that she is entitled to summary judgment on her breach of contract claim. A reasonable factfinder could conclude that Amdex is not liable to Wang for its breach of contract. Wang’s motion for summary judgment (ECF No. 42) is **DENIED** as to her claim for breach of contract (Count II).

### 3.    Counterclaims

Finally, Wang seeks summary judgment on Amdex’s counterclaims for breach of contract and specific performance. For the reasons stated above, Wang is not entitled to summary judgment on the counterclaims. Whether Amdex owes Wang a Recompete Payment turns on the resolution of material facts in dispute. The Court cannot resolve disputed facts at summary judgment. The same goes for Wang’s argument that she need not return any retirement plan contribution to Amdex. To make this determination, disputed material facts must be resolved first. And as for Wang’s argument that Amdex never incurred any damages because the only damages were incurred by Avar, the company that Amdex now owns, the Court is not persuaded. Because there

are material facts in dispute about whether Amdex incurred damages, and because Wang has not shown that she is entitled to judgment as a matter of law on Amdex's counterclaims, her motion for summary judgment (ECF No. 42) is **DENIED**.

**V.      Conclusion**

There are material facts in dispute that must be resolved before the Court can assess the parties' claims. Neither party is entitled to summary judgment. The parties shall file a status report within 14 days of the date of this Order stating (1) whether the parties would like to have a settlement conference with Judge Quereshi, to whom this case has been referred for mediation, and if not, (2) the parties' availability for a call during the week of April 8-12, 2024, to schedule a trial date.

Sincerely yours,


_____/s/_____
Timothy J. Sullivan
Chief United States Magistrate Judge

10